## Hilbish *et al. versus* Catherman *et al.*

1. Where a draft was impending, school directors agreed to pay for recruits $400 each, they could not be had for less than $550. Public meetings, at which there was a general turnout, were held, and it was arranged that a subscription to pay the excess over $400 should be raised, seventy-six pledged themselves " to raise bounty for volunteers." There was no agreement or understanding or expectation that a law would be procured for repaying the subscriptions. An act was passed authorizing the school directors to levy a tax to repay the subscriptions. *Held,* that the act was constitutional.

2. An act cannot be declared unconstitutional unless its violation of the Constitution is so manifest as to leave no reasonable doubt.

3. Taxes are the revenue collected from the people for objects in which they are interested ; for things useful and conducive to their welfare.

4. There is no difference between a precedent authority for payment to such an object and a subsequent compensation for the same thing.

5. It is not the hope or expectation of repayment which constitutes the ground of authority to refund, but the public benefit received, which creates the moral obligation and constitutes a sufficient consideration.

6. The bounty system is exceptional, temporary and peculiar.

7. Weister *v.* Hade, 2 P. F. Smith 474, and Tyson *v.* School Directors of Halifax, commented on.

January 25th 1870. Before THOMPSON, C. J., READ, AGNEW, SHARSWOOD and WILLIAMS, JJ.

Appeal from the decree of the Court of Common Pleas of *Union county :* In Equity : No. 257, to January Term 1870.

On the 19th of April 1868 Jacob Hilbish and others filed a bill against Ira Catherman and others, school directors of Lewis township, Abraham Mensch, treasurer, and Christian Mensch, collector of the same township. The bill set out :—

3. The school directors of Lewis township, on the 14th of March 1868, levied a tax for the sum of $3450 for the purpose of refunding to those who contributed by subscription to the bounty fund to raise its quota under the last call of the President " such sum as they respectively paid to said fund above the amount collected from them by law," and issued a warrant to the collector to collect the sum and pay it to the treasurer of the bounty fund, who should pay to each subscriber such part of his subscription as had not been refunded to him, with costs and expenses incident to raising said fund.

4. Set out the amount levied on the plaintiffs.

5. The tax was illegal, without authority of law, and unconstitutional.

6 and 7. The subscription for which the tax was levied was voluntary, without any promise, understanding, agreement or expectation that it would be refunded by taxation to make up a fund to pay volunteers to clear the township from the draft.

The defendants answered—

3. It required seventeen men to fill the quota of the township

[Hilbish v. Catherman.]

under the last call of the President. By then existing laws the township could not levy a bounty tax for more than $400 for each volunteer. Volunteers could not be obtained for less than $550 each, and it became necessary to raise the excess over $400 by other means than taxation. Certain citizens, at the request of a large majority of the citizens and the school board, subscribed to the amount of $4200, of which $3447.47 were collected and appropriated towards procuring volunteers, and the tax complained of had been levied to repay the subscriptions.

5. There was at the time of the subscription "no understanding or agreement either amongst the subscribers themselves or between them and any of the constituted authorities or citizens of said township, that the same was to be refunded or paid back by taxes to be levied upon said township."

6. Denied that levying the tax was illegal or unconstitutional, but had been done under an Act of Assembly of the 14th of February 1868, Pamph. L. 145, as follows :—

"Whereas, the board of school directors of Lewis township, Union county, in order to raise its quota of men under the last call for troops by the President, levied and collected a tax for that purpose; but under the law then in force they could not lay the tax for more than would pay each man a bounty of $400: And whereas, men could not be got for less than a bounty of $550, and in order to make up the excess over the amount of what the tax levied would cover, a subscription was got up which was signed by about seventy-five individuals, each one subscribing a certain sum, out of which subscription the excess required was raised and the quota filled : And whereas, it would be right and fair that the persons who contributed to the sum required to make up the aforesaid sum, should have the amount which they respectively paid refunded out of a tax laid on the taxables of the township in order to equalize the bounties among all alike; therefore,

" Sect. 1. Be it enacted that the school directors of Lewis township, in the county of Union, be and they are hereby authorized and directed, as soon after the passage of this act as may be, to levy and collect from the taxables of said township, in the same way school taxes are by law levied and collected, a sum not exceeding $3450, for the purpose of refunding to those persons who contributed by subscription to the bounty fund of said township, in order to raise its quota of men under the last call of the President, such sum as they respectively paid to said fund above and beyond the amount that was levied and collected from them by law, that is, in pursuance of said subscription ; which sum as soon as collected shall be paid into the hands of Abraham Mensch, treasurer of the school board, whose duty it shall be to pay to each of said subscribers such part of his subscription as has not been refunded to him already, and then the costs and expenses inci-

dent to raising said fund, and putting the men into the service of the United States; should any balance be left after the payment and distribution aforesaid, then the same shall vest in the school fund."

The case was referred to Alfred Hayes, Esq., as master. The facts are found in his report.

He reported:— * * ,

" That a number of meetings, ranging from two to six and perhaps more, were held in the month of March 1865, of the taxable citizens of Lewis township for the purpose of procuring volunteers and raising the money to pay men the necessary bounties, in order to save the township from an impending draft, the quota of said township being seventeen, at that call of the government of the United States for volunteers. At these meetings there was a general turnout of the citizens, and a majority of the school directors attended. These meetings were organized. * * * Resolutions were adopted and minutes of the meeting were kept, but the minutes have been all lost or mislaid. At these meetings there was no doubt expressed but that the authorities would levy a tax up to the full amount of $400 per volunteer, as provided by the Act of Assembly of the 15th of March 1865. It was the positive understanding that the authorities would raise $400 per volunteer in that way. No volunteers could be procured for less than about $550 per volunteer, and in order to raise the balance of excess over and above the $400 which could be got by taxation, recourse was had to a subscription on the part of the citizens of the township, that being considered by them the only feasible plan of raising the money. The subscription was headed as follows: 'We the undersigned citizens of Lewis township, in the county of Union, pledge ourselves to the sums opposite our names to raise bounty for volunteers for said township to be collected by a due course of law, or waiving the exemption law,' to which subscription paper are appended the names of some seventy-six of the citizens of Lewis township, subscribing a sum amounting in the aggregate to about $4200. The subscription paper was principally signed at one of the meetings, though the paper was also carried to a number at their residences who subscribed there. This subscription paper was signed with the understanding that the school directors were to levy and assess a tax for the sum of $400 per volunteer; that the rest of the money necessary to procure and put in the volunteers was to be raised by subscription, and if, after putting in the volunteers, any balance or surplus remained, said balance or surplus was to be refunded to the subscribers *pro rata*, and, as before stated, the subscription was made to raise volunteers to fill the quota of Lewis township under the call of the government of the United States for troops. With the tax of $400 per volunteer, and the

[Hilbish v. Catherman.]

amount of the subscription thus taken, there were ample funds to procure and put the volunteers into the service. The seventeen men constituting the quota were obtained and mustered in. All the expenses incident to this business were paid. A surplus remained on hand, and this surplus was divided among the subscribers *pro rata*, giving to each one a return of about 22 per cent. on his subscription. This disposes of all the important facts concerning which testimony was produced before the master with one exception, to wit, whether at the time these subscriptions were made, they were made with or upon the agreement, understanding, hope or expectation that an Act of Assembly would be afterwards passed to raise by taxation a fund for the purpose of repaying these subscriptions." * * *

"The master has no hesitancy in arriving at the conclusion that the subscriptions were made and the money paid without any agreement, promise, understanding, hope or expectation that the subscribers would ever have their subscriptions or any part of theirs refunded out of moneys raised by taxation. There is no evidence of any resolution being adopted at any of the meetings looking toward the future laying of a tax to refund the subscriptions, or toward the procurement of an Act of Assembly for that purpose. There was no announcement of that kind made by the school directors, corporate authorities or the officers of the meetings to subscribers. Those who subscribed at their residences or at other places than the meeting, according to the testimony, clearly did so either without anything at all being said about the refunding of their subscriptions, or at most only a repayment of the surplus." * * *

"These subscriptions, therefore, the master finds not to be advances made to the school directors, corporate authorities or any committee of citizens upon a promise, understanding, hope, expectation or agreement of future reimbursement, either from moneys to be raised by taxation or otherwise, but to be mere voluntary donations to the bounty fund, and that when said subscriptions were made and the money paid over, the subscribers (saving the hope of a return of the surplus not required for the purpose) believed that they had parted with their money for ever.

"The Act of 14th February 1868 is in evidence in this case. The enforcement of the provisions of this act is the ground of complaint on the part of the plaintiff, and the origin of this suit in equity; but the taxes complained of by the plaintiffs cannot be said to be levied and assessed without authority of law, unless said Act of Assembly be invalid." * * *

"The present case depends upon this Act of 1868, the constitutionality of which is denied by the plaintiffs and affirmed by the defendants, and the whole question is narrowed down to this: Can the legislature of the Commonwealth constitutionally pass an act

[Hilbish *v.* Catherman.]

authorizing a tax to be levied, assessed and collected for the purpose of refunding to the subscribers their subscriptions previously made and paid to a bounty fund, voluntarily donated at the time, without any promise, agreement, hope or expectation that the same would ever be refunded to them? With this question the master declines to deal. * * * He finds upon the statute book this Act of Assembly of 14th February 1868, authorizing and directing the school directors to levy and collect a certain sum of money for the purpose of refunding these very subscriptions. The levying and collecting of these taxes, complained of by the plaintiffs, is fully authorized and warranted by this special act. Whatever the facts may be, the master does not consider himself the proper authority or tribunal to declare said action invalid or unconstitutional. It must therefore necessarily be regarded by the master as constitutional and valid, and if so, the conclusion is plain that the plaintiff's bill must be dismissed at his costs."

The court (Woods, P. J.), after exceptions, confirmed the report of the master, and dismissed the bill with costs.

The plaintiffs appealed, and assigned this decree for error.

*J. M. Linn* and *W. C. Lawson*, for appellants, cited Menges *v.* Dentler, 9 Casey 495; Phila. Association *v.* Wood, 3 Wright 84; Norman *v.* Heist, 5 W. & S. 171; Caster *v.* Tidewater Co., 7 Amer. L. Reg. 760; Herser *v.* Casselberry, 23 Leg. Int. 405; Tyson *v.* School Directors, 1 P. F. Smith 9.

*A. H. Dill, J. C. Bucher* and *W. Van Gezer*, for appellants, cited Speer *v.* Blairsville, 14 Wright 150; Sharpless *v.* Philadelphia, 9 Harris 147.

The opinion of the court was delivered, May 5th 1870, by

AGNEW, J.—This case differs from any bounty case yet decided, and requires its facts to be clearly stated, in order to perceive their true bearing and the proper principles to be applied. They are these. In March 1865, a draft was impending under the last call of the President of the United States for troops. Seventeen was the number apportioned to Lewis township, Union county, under the Acts of Congress, which recognised the municipal divisions of the state for draft purposes, and enabled the draft to be avoided by the enlistment of volunteers. The school directors of the township were willing to levy a tax, and to pay bounties to volunteers to enable the township to escape the draft, but the laws then in force limited the sum to be paid to each volunteer to $400; and it was found they could not be had for less than $550. Public meetings were held, at which there was a general turnout of the citizens, and a quorum of the school board was present. It was arranged that the school directors should levy a tax to the

extent of $400 for each volunteer, and that a subscription should be raised to pay the excess. Seventy-six subscribers pledged themselves in writing "*to raise bounty for volunteers for said township.*" There was no agreement or understanding—not even a general expectation, that a law should be procured for repayment of these subscriptions; but the school directors levied a tax and paid $400 to each volunteer, and the subscribers paid the excess. An Act of Assembly was passed on the 14th of February 1868, Pamph. L. 145, reciting these facts substantially, and stating that it would be fair and right that the persons who contributed the sum required to pay the excess, should be refunded by a tax on all the taxables of the township, in order to equalize the bounties among all alike. The act then gave authority to the school directors of Lewis township to levy and collect a tax for the purpose, and they are now proceeding to do so. The plaintiff's bill seeks to restrain them on the ground that the act referred to is unconstitutional.

In order to determine the case the bearing of the facts stated must be noticed.

1. The money was subscribed for a public, useful and indeed imperative purpose, recognised as such by this court in repeated decisions.

2. It was done with the approbation and general desire of the citizens, expressed at public meetings.

3. It was done in aid of the township, and concurrently with the action of its constituted authorities, acting up to the limit of the powers conferred by law. The simple proposition therefore is, whether the legislature is not competent to tax the township to refund the money advanced for its benefit, in aid of its citizens, and expended with their approbation and that of their public officers. We cannot declare this act unconstitutional unless we can say, in the language of Judge Tilghman, that "its violation of the constitution is so manifest as to leave no reasonable doubt:" Com. v. Smith, 4 Binn. 123; or, in the language of many federal and state judges, that it violates the constitution so clearly, palpably, plainly, as to leave no doubt or hesitation in our minds: Sharpless v. Philada., 9 Harris 164; or, unless we can deny that a tax law must be considered valid, unless it be for a purpose in which the community has palpably no interest: Id. 168. How can we say this, unless we hold that the many hundred laws on our statute book, never heretofore questioned, are void, granting pensions and gratuities for past services, swords, medals, and mementoes for illustrious public actions, rewards for useful arts, donations to fire companies, agricultural societies, colleges and schools, imposing taxes to pay for property destroyed by mobs, and many other matters which will occur to every one.

What are taxes but the revenue collected from the people for

[Hilbish *v.* Catherman.]

objects in which they are interested—the contributions of the people for things useful and conducive to their welfare? This being the purpose of taxation, there can be no difference between a precedent authority for payment to such an object and a subsequent compensation for the same thing. The case before us is a fit illustration. Here was a general law conceded to be valid to the extent of the $400 of the $550 needed to pay the volunteer. But that less sum could not procure him. Had the general law extended the limit to $550 the whole sum could have been levied by taxation. But as to the public object and interest there is no difference between the $400 authorized to be paid and the $150 not authorized. The $150 was advanced for the same purpose, paid to the same persons and at the same time, and in relief of the same people. The special act simply comes in to compensate for the excess. As it regards the public on what different footing does it stand? There is no difference between this case, and that of one who builds a bridge or a court-house for a specified sum. He can recover no more; but if in fact he has, by a rise in prices, an act of God, or for any other good cause, been compelled to expend a larger sum, will any one doubt the power to pay the actual cost of the work out of the public treasury? The public received the benefit, and it is just and right that the public money should pay for it.

But it is said this court has heretofore held that there can be no recovery of bounties without a contract with the public to pay them; and that no taxes can be laid to refund advances for bounties, without they were made on the public credit. This is true, but why is it true? Because such has been the bounty system of the state. The legislature, by its general system, properly made bounties dependent upon the consent of the public authorities, to prevent unwarranted burthens being laid upon the people. They therefore required a precedent authority. But in this act they have chosen to provide compensation for a precedent thing. We have not decided in any case that an advance of money, made for the actual benefit of the public, cannot be compensated, though made at the time without legal authority, or an expectation of its being repaid. It is not the hope or expectation of repayment, which constitutes the ground of authority to refund; but the public benefit received. That it is which creates the moral obligation —that imperfect but conscientious duty, which constitutes a sufficient consideration, either for a public or a private agreement to pay for the benefit conferred. In principle Weister *v.* Hade, 2 P. F. Smith 474, decides this case. The only difference is that there the subscriptions were made upon the common understanding among the people and their authorities that a law would be procured to refund the money subscribed. But it is manifest that understanding could create no public liability to refund—it only

[Hilbish *v.* Catherman.]

intensified the moral duty, but it was the public use of the money only, which warranted the passage of the law to refund it. We made that understanding an element because we found it in the case; and for the same reason influencing us in all our decisions upon the bounty laws, we have adhered closely to the facts in each case. The whole system is exceptional, temporary and peculiar, and we have constantly endeavored to keep every case within its strictest limits, taking no step in advance, and indicating no liability beyond that which the precise extent of each case called for. Hence expressions may be found in some opinions, more restrictive than the present case will admit of. That is especially so in Tyson *v.* School Directors of Halifax, 1 P. F. Smith 9. The precise point decided in that case was that the claim of the Bounty Association of Halifax township did not fall within the true meaning and sense of the special Act of August 25th 1864. Some of the expressions in the opinion of our Brother Thompson would indicate a belief inconsistent, probably, with the decision now pronounced. But it is just to say that he dissented from the judgment of the court in Spear *v.* The School Directors of Blairsville, 14 Wright 150; and whenever the naked question of the power to pay bounties has arisen, he has not agreed with the majority. Could we look upon taxation to pay bounties to volunteers to relieve the township from a draft as the application of public moneys to private ends, we should agree that the principles decided in Norman *v.* Heist, 5 W. & S. 171, and cases of like character, would forbid the application of the public revenue to the payments made in this case. The simple fact in Norman *v.* Heist was that an Act of Assembly ordered the property vested by law in one person to be transferred to another. It cannot be doubted that the legislature cannot take the property of one man and give it to another; it cannot tax the public to give the revenue to a wholly private object; and it cannot tax a few individuals to perform a general public work. In Hammett *v.* City of Philadelphia, decided May 1869, and Durach *et al. v.* Borough of Johnstown, 12 P. F. Smith 491, we have had occasion recently to examine with much care the foundation of the power to tax, and we cannot see that the Act of Assembly in the present case transgresses the limits of legislative power.

The decree of the court below is therefore affirmed, with costs.

THOMPSON, C. J., dissented.